MARVIN, Chief Judge.
We reversed this defendant’s conviction of attempted first degree murder because the trial court erroneously instructed the jury about specific intent. State v. Rubin, 559 So.2d 550 (La.App.2d Cir.1990).[1]
After being again tried and convicted by a jury, Rubin appeals to question whether the evidence was sufficient to convict and whether or not a mistrial should have been declared. Rubin also complains that his sentence to 50 years at hard labor is excessive.
We affirm the conviction. We amend the sentence to allow credit for time served on this charge and, as amended, affirm the sentence.
SUFFICIENCY OF THE EVIDENCE
The State had to prove Rubin had the specific intent to kill the victim, that the victim was a peace officer engaged in the performance of his lawful duties and that *1291 Rubin, having such specific intent, did an act for the purpose of and tending directly toward the accomplishment of the offense intended. LRS 14:27, 14:30; State v. Strother, 362 So.2d 508 (La.1978); State v. Odom, 511 So.2d 1214 (La.App.2d Cir.1987), writ denied.
Two of Rubin’s assignments relate to the State’s burden and whether the evidence met that burden.
We must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to allow a rational trier of fact to conclude that all of the elements of the crime had been proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Specific intent, a state of mind, need not be proved as a fact. It may be inferred from the circumstances of the transaction and the action and actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982); State v. Dean, 528 So.2d 679 (La.App.2d Cir.1988).
The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Huizar, 414 So.2d 741 (La.1982); State v. Butler, 322 So.2d 189 (La.1975).
After dark on February 25, 1985, the victim, Deputy Sheriff Powell, was looking for Rubin to set up a meeting with a state fire marshal’s investigator about a fire of suspicious origin that occurred' in Rubin’s house.
Powell testified that he was employed on that date as a Franklin Parish Deputy Sheriff. He was on duty that night, wearing his police uniform and driving a marked patrol car equipped with official decals on the doors and a bar light across the roof. The reflective decals on the car were easily recognized at night. Powell said Captain Claude Butler of the Winnsboro Fire Department asked him to give Rubin a message to meet the investigator. Deputy Powell and Rubin had known each other “all of (Powell’s) life.”
Seeing Rubin driving his car, Powell drove up beside him to deliver the message. They were face to face, six feet apart, when Rubin “took off after looking squarely at Powell. Rubin drove through a stop sign at a rate of 30 or 35 mph, which was above the posted city speed limit on that street.
Earlier in the day while Powell was off duty, he had seen Rubin drinking beer while driving. Because of Rubin’s erratic driving that night, Powell suspected Rubin was intoxicated and decided to stop Rubin “to see why he was driving like he was doing.” With Powell behind him, Rubin drove into a dead end street and then drove and parked behind his aunt’s house. Powell pulled in the driveway of the house awaiting Rubin’s appearance. After two or three minutes Powell got out of his car with only a flashlight in his hand and walked toward the corner of the house behind which Rubin had parked.
The area was well lit by a street light and by the lights of Rubin’s car, which was parked with its motor running. Rubin then came around the corner carrying a rifle or shotgun “in an aiming position” with the butt somewhere between the shoulder and elbow area. Powell and Rubin were in close proximity and again face to face.
Powell yelled “Don’t shoot” and turned away, toward the house. Rubin then shot Powell in the right side, dropped the weapon, went around the back of the house and fled the scene. Other police later found Rubin’s car, still parked with the engine and lights on. Rubin was found the next morning, armed with a .30-30 rifle. The officers had to physically subdue and overcome Rubin to arrest him.
Dr. Busby treated Powell in the emergency room of the Franklin Parish Hospital for the gunshot wound. Because the bullet penetrated Powell’s colon, a colostomy was performed. Dr. Busby was not able to recover all the bullet fragments. The wound was life threatening. Had Powell not turned when Rubin fired, Powell probably would have died within seconds, according to Dr. Busby. The bullet also struck Powell’s ribs, eventually causing a hernia, extremely difficult to repair.
*1292 Daniel Brooks testified that earlier on the day of the incident he and Rubin talked about their going to City Court that day. Rubin told Brooks that if any “law” came to his house there would be trouble. Brooks went to City Court on that day. Rubin did not.
Charles Cureington, an employee of the Franklin Parish Hospital, testified that he heard Rubin say to a deputy that he had shot Deputy Powell with a rifle.
After the State rested its case in chief, Rubin rested.
The evidence which we have summarized allows us to find that a reasonable trier of fact could have concluded beyond a reasonable doubt that Rubin had the requisite specific intent to kill. Rubin had expressed his intent to cause trouble if “the law” came after him. He had ample opportunity to recognize Powell, both before the traffic incidents began and at the time of the shooting in a well-lit area. Powell’s yelling “Don’t shoot” and turning away afforded Rubin further time and opportunity again to consider his course of action. Rubin armed himself with a high powered rifle after he parked his car. Approximately three minutes later he aimed and fired the rifle at the victim, whose pistol was in its holster and who had said “Don’t shoot.”
The conduct of Rubin’s deliberately aiming and discharging a firearm directly at Powell under these circumstances allows the conclusion, beyond a reasonable doubt, that the offender actively desired to kill Powell. LRS 14:30. That is specific intent. LRS 14:9, 14:10. See State v. Ford, 467 So.2d 1243 (La.App.2d Cir.1985), writ denied.
The evidence was sufficient to convict. Jackson v. Virginia, supra.
JURY INSTRUCTIONS
Defendant contends the trial court erred in instructing the jury that anything the sheriff tells his deputy to do constitutes a lawful duty of a police officer.
On February 26, 1985, Grady Smith, an arson investigator employed by the State Fire Marshal, investigated a fire which occurred in Rubin’s house. Smith told the Winnsboro firemen to contact Rubin to set up an interview.
Claude Butler, Fire Captain, passed Smith’s request to the victim, Deputy Powell. This type of interdepartmental cooperation was common.
Powell testified that as part of his normal duties he would check buildings, answer calls, serve warrants and deliver messages. Powell had been assigned the duty of delivering messages many times by the Sheriff, Eugene Parker. Powell intended to give that message to Rubin when he drove up beside Rubin. Powell then drove after Rubin, whom he suspected of being intoxicated, because Rubin drove over the speed limit and through a stop sign. Powell said he usually would follow a driver in such circumstances. It would not be unusual for any police officer to follow any citizen behaving in such a manner, according to this record.
Sheriff Parker testified that his deputies, including Parker, were required and had the duty, to assist other agencies and departments. The Sheriff also testified that a deputy should investigate a recklessly driven vehicle “to whatever extent it would take to come to a conclusion about it.”
Following a charge conference, and over defense counsel’s objection, the court instructed the jury that
Each individual Sheriff must determine policy, scope of activity of his deputies and the job description of his deputies so that his department can discharge the duties and responsibilities placed upon it by State law. Thus, if you find that Dy. Powell was acting within the policy, scope of activity or job description required by Sheriff Parker, you must find that Dy. Powell was in the performance of his lawful duties. If you find that Dy. Powell was not acting within the policy, scope of activity or job description required by Sheriff Parker, you must find that Dy. Powell was not in the performance of his lawful duties.
Rubin cites no authority for the proposition that a sheriff cannot assign general or specific duties to his deputies which aid the *1293 efforts of other law enforcement and investigative agencies. CCP Art. 331 requires deputies to perform the duties the sheriff assigns;
Moreover, when Deputy Powell observed Rubin violating the speed law and running the stop sign, Powell had the authority to pursue and stop Rubin to determine the basis for his activities and to arrest him, if necessary. CCrP Arts. 213, 215.1.
This assignment is without merit.
MOTION FOR MISTRIAL
Rubin contends the trial court erred by failing to declare a mistrial during closing argument. Counsel argues that when the prosecutor said
Flight from prosecution—flight from apprehension—flight from having to discuss with the law enforcement officer shows the man’s intent,
he made an impermissible reference to Rubin’s exercise of his right to remain silent after he was arrested, contrary to the presumption of innocence afforded one accused of a crime.
In context, it is clear the prosecutor was talking about Rubin’s flight from Deputy Powell when their cars were side by side and Powell intended to tell Rubin the fire marshall wanted to interview him. The statement also is suggestive of Rubin’s declared intent to another to make “trouble” for the “law,” and do whatever was necessary to avoid being questioned about the fire before the chase and the shooting. Powell did not then intend to take Rubin into custody or arrest him. After counsel’s belated objection, the court ruled that the prosecutor did not comment upon Rubin’s exercise of his right to remain silent, not to incriminate himself.
CCrP Art. 770(3) requires a mistrial when the state refers to a defendant’s failure to testify in his own behalf. State v. Johnson, 541 So.2d 818 (La.1989). The prosecutor’s remarks do not reach that level.
Evidence of flight may be admissible on the issue of guilt. State v. Wilkerson, 403 So.2d 652, 659 (La.1981); State v. Mills, 505 So.2d 933, 948 (La.App.2d Cir.1985), writ denied. Rubin’s flight tended to show his efforts to avoid apprehension; thus, that he intended to prevent his capture. Evidence of his flight, therefore, was relevant to show his intent.
We find no merit to this assignment.
EXCESSIVE SENTENCE
In his final assignment, Rubin contends the sentence he received is excessive “considering the totality of the circumstances as presented at trial.” Rubin stressed in brief that he had no substantial criminal record, he had not committed any felonies, and he had no record of violent acts. Rubin was sentenced to the maximum permissible term of imprisonment: 50 years at hard labor. LRS 14:30C, 14:27D(1).
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in CCrP Art. 894.1. The trial court is not required to list every aggravating or mitigating circumstance. The record must reflect that the sentencing factors were adequately considered. State v. Smith, 433 So.2d 688 (La.1983).
Articulation of the factual basis for a sentence is the goal of CCrP Art. 894.1. Mechanical compliance with its provisions is not required. Defendant’s personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation must be considered. State v. Jones, 398 So.2d 1049 (La.1981); State v. Hudgins, 519 So.2d 400 (La.App.2d Cir.1988), writ denied.
Deterrence is a legitimate sentencing object. State v. Howard, 263 So.2d 32 (La.1972); State v. Tully, 430 So.2d 124 (La.App.2d Cir.1983), writ denied.
The trial court noted that 18 various charges had been filed against Rubin from 1978 to 1985. Although almost all of these offenses were misdemeanors (there were *1294 no convictions arising from the few felony charges), the trial court nevertheless noted that four of the prior charges against Rubin were direct crimes against the person. In 1978, Rubin was indicted for aggravated rape. Rubin’s record shows no disposition of that charge. On September 2, 1979, Rubin assaulted Prances Benjamin. On February 14, 1980, Rubin committed a battery on Lillie Mae Johnson by hitting her in the face with his fist and throwing her to the ground. On March 3, 1982, Rubin committed simple battery against Rosie Thomas by hitting her face and body with his fists. The pre-sentence investigation shows that Rubin was at one time married to Ms. Thomas and that Ms. Johnson had a child by Rubin.
The court felt there was an undue risk that during the period of a suspended sentence or probation, Rubin would commit another crime. It was felt that Rubin was in need of a correctional or custodial environment which could be provided most effectively by his commitment to an institution. The court said any lesser sentence would deprecate the seriousness of the offense. The trial court also considered as an aggravating factor Rubin’s statement on the day Powell was shot, that if the “law” came around there would be “trouble.” The PSI indicated that Rubin had said if anyone tried to take him to city court he would shoot that person.
The court cited five incidents since 1976, excluding the instant case, in which a police officer was attacked or killed while in the performance of his duties. The trial court therefore considered a severe penalty was proper.
Other factors, some mitigating, that were pertinent to Rubin’s sentence are contained in the PSI referred to by the court. Rubin’s mother died when he was two, his father then deserted the family and Rubin was raised by his maternal grandparents. Rubin quit school in the tenth grade because he needed to work after impregnating Lillie Johnson. The PSI shows that Rubin later impregnated Rosie Thomas while he was living with Ms. Johnson. He ultimately married Ms. Thomas and they had another child. Thus, two of Rubin’s three children were born out of wedlock. The PSI also reveals that Rubin has held numerous jobs, most of them either in farm labor or construction work.
We also consider whether the sentence imposed is too severe given the circumstances of the case and the background of the defendant. A sentence violates LSA-Const. Art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or is purposeless or needless. State v. Bonanno, 384 So.2d 355 (La.1980).
A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it is so disproportionate as to shock one’s sense of justice. State v. Hogan, 480 So.2d 288 (La.1985). The trial judge has discretion in the imposition of a sentence within the statutory limits. We do not set aside a sentence as excessive absent a manifest abuse of discretion. State v. Square, 433 So.2d 104 (La.1983); State v. Hudgins, supra.
Rubin committed a very serious crime. Fortunately, the shot did not prove fatal. Rubin has a history of violent behavior. Rubin specifically intended to kill Deputy Powell and almost accomplished that consequence.
We have affirmed a 50-year hard labor sentence for attempted first degree murder. In State v. Pettaway, 450 So.2d 1345 (La.App.2d Cir.1984), writ denied, we found no abuse of discretion in the imposition of the maximum sentence even in light of the defendant’s history of mental problems and the relatively inconsequential prior criminal history of the defendant (two misdemeanors). Pettaway disarmed a police officer and shot him repeatedly without provocation, leaving the officer permanently disabled.
We also affirmed a maximum 50-year hard labor sentence for attempted first degree murder of a police officer in State v. Allen, 478 So.2d 589 (La.App.2d Cir.1985), writ granted in part, denied in part, affirmed as amended, 496 So.2d 301 (La.1986).
*1295 Although severe, Rubin’s sentence to the maximum does not shock one’s sense of justice.
ERROR PATENT REVIEW
It is noted that the trial court, in imposing sentence, did not give Rubin credit toward service of his sentence for time spent in actual custody prior to the imposition of sentence as required by CCrP Art. 880.
Under CCrP Art. 882(A) an appellate court may correct an illegal sentence on review. State v. Gaines, 557 So.2d 340, 343 (La.App. 3d Cir.1990); State v. Martin, 557 So.2d 449, 452 (La.App. 5th Cir.1990).
DECREE
Rubin’s conviction is affirmed. We amend the sentence to allow credit to Rubin for time served on this charge.
AMENDED, and, as amended, AFFIRMED.

. Cases from this court should not be interpreted to suggest that a conviction for attempted murder might be sustained on a showing of specific intent to inflict great bodily harm. See, e.g., State v. Knighton, 449 So.2d 1171, 1174 (La.App.2d Cir.1984); State v. Hill, 431 So.2d 871, 874 (La.App.2d Cir.1983), writ denied.